IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:21-cr-00275-RAH-SRW |
| | ) | |
| JOHNNIE PAGE LOTT and | ) | |
| CARMEN BROOKE LOTT | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Before the court are Defendant Johnnie Page Lott's motion to suppress (Doc. 49) and Defendant Carmen Brooke Lott's motion to suppress (Doc. 50). For the reasons set forth below, the court concludes that the motions to suppress are due to be denied.

## I.    Introduction

Defendant Johnnie Lott is charged in the indictment with conspiring to distribute and possess with intent to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. § 846, and both he and Defendant Carmen Lott are charged with money laundering conspiracy in violation of 18 U.S.C. § 1956(h). (Doc. 1). Defendants move pursuant to the Fourth Amendment of the United States Constitution to suppress the evidence found in the search of the residence at 2661 Dawes Court, Mobile, Alabama on June 3, 2020, as well as any fruits of that evidence or statements made as a result of the search. (Doc. 49, at 1; Doc. 50, at 1; Doc. 54-1).[1,2] Specifically,

---

[1] Unless otherwise stated, citations are to the Court's ecf pagination. References to transcript pages are denoted with a "p."

[2] According to Defendants, the evidence seized consisted of cash, credit cards, and electronic cash receipts. (Doc. 49, at 3; Doc. 50, at 3).

Carmen Lott contends that the affidavit submitted in support of the search warrant failed to establish a nexus between her, the residence, and the criminal acts alleged, and that the communications between her and Johnnie Lott are protected by the marital communication privilege. (Doc. 50. at 4, 7). Johnnie Lott contends that the search warrant affidavit failed to establish probable cause that he committed the crimes charged in the indictment, that the affidavit failed to establish probable cause that evidence of a crime would be found at the residence, that the affidavit omitted the fact that drugs were seized from codefendant Maurice Sanders four days prior to the issuance of the search warrant, and that the affidavit lacked corroborating evidence. (Doc. 49, at 2-4, 6). Defendants ask the court to conduct an evidentiary hearing on this matter. (Doc. 49, at 1; Doc. 50, at 1).

## II.    Background

On May 28, 2020, James Ranson, a Task Force Officer ("TFO") of the United States Department of Justice, Drug Enforcement Administration ("DEA"), High Intensity Drug Trafficking Area ("HIDTA") Task Force,[3] applied for and obtained a search warrant for the residence located at 2661 Dawes Court, Mobile, Alabama. (Doc. 54-1). In the sworn affidavit submitted in support of his application for a search warrant, Ranson stated that his investigation had revealed that Carmen Lott and Johnnie Lott, and others, were participating in a drug trafficking organization that distributed various quantities of synthetic cannabinoid ("Flokka"), marijuana, and methamphetamine from Mobile, Alabama to various Alabama correctional facilities, including

---

[3] At the time of his search warrant application, Officer Ranson had been a TFO with the DEA since January 2019 and had been employed by the Alabama Law Enforcement Services Division ("ALESD") Investigation Bureau since January 2017. (Doc. 54-1, at p. 1). Ranson was previously employed by the Montgomery, Alabama Police Department from June 1994 through January 2017 and had been a member of law enforcement for approximately 27 years. *Id*. at pp. 1-2. The majority of his law enforcement career had been spent investigating drug crimes, and he had participated in long-term, historical investigations of drug distribution organizations. *Id*. at p. 2.

Kilby Correctional Facility ("KCF"') located in Montgomery County, Alabama, and Fountain Correctional Facility located in Escambia County, Alabama. *Id*. at p. 2. Ranson attested that in March 2020 he was provided recorded telephone conversations captured by the Alabama Department of Corrections ("ADOC"). *Id*. at p. 3. According to Ranson, the telephone conversations were recorded by the ADOC, consistent with its policy of recording the phone conversations of its inmates, and that prior to any telephone conversation's commencing, both parties to the call are advised by a voice recorded message that their conversation is being recorded. *Id*. Ranson states in his affidavit that the "telephone conversations in question were located by performing a search for Carmen Lott's telephone number." *Id*.

According to Ranson, after he obtained the recorded telephone conversations, he analyzed them and determined that Carmen Lott and Johnnie Lott discussed the distribution and sale of controlled substances. *Id*. Ranson further attested that Carmen Lott and Johnnie Lott also openly discussed financial transactions related to proceeds from the sale of controlled substances, and monies obtained through other illegal activity. *Id*. Ranson set forth in his 45-page affidavit an excerpt of a transcript of a series of telephone calls between Carmen and Johnnie Lott that occurred between March 8, 2020 and April 27, 2020, along with Ranson's analysis of each excerpted call. *Id*. at pp. 3-41.[4] Based upon the facts set forth in his affidavit, and his training and experience regarding investigations involving organized crime and narcotics activities, Ranson concluded that probable cause existed to believe that the residence located at 2661 Dawes Court, Mobile, Alabama, contained evidence of drug distribution and laundering of drug proceeds. *Id*. at p. 42.

---

[4] The relevant portions of the excerpted transcript will be discussed in connection with the specific arguments raised by Defendants.

Finding probable cause to issue the search warrant, United States Magistrate Judge for the Southern District of Alabama Sonja Bivins signed the warrant on May 28, 2020. *Id*. at 1-2.

## III.    Legal Standard

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. In issuing a warrant, a judge is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (quotation omitted); *see also United States v. Jiminez*, 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting *Gates*, 462 U.S. at 238). The court must find only that the judge had a "substantial basis" for concluding that probable cause existed to uphold the warrant. *See Gates*, 462 U.S. at 238; *see also Massachusetts v. Upton*, 466 U.S. 727, 728 (1984). The validity of the warrant is reviewed based on the totality of the circumstances. *See United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999). "'[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts[.]'" *Id*. (quoting *Gates*, 462 U.S. at 232).

"Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determination." *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994). Suppression of evidence is only required where the affidavit supporting the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Brown v. Illinois*, 422 U.S. 590, 610-11 (1975).

4

"[T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Upton*, 466 U.S. at 734 (citation and internal quotation marks omitted).

## IV.    Discussion

### A.    Carmen Lott-Probable Cause[5]

Defendant Carmen Lott argues that probable cause did not exist for the issuance of a search warrant for the residence in question because Ranson's affidavit failed to demonstrate a nexus between the place to be searched, the alleged criminal activity, and Defendant. (Doc. 50, at 4).

A warrant affidavit "'should connect the place to be searched with the defendant and the criminal activity.'" *United States v. Donaldson*, 558 F. App'x 962, 968 (11th Cir. 2014) (quoting *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002)). However, a specific allegation that illegal activity occurred at the place to be searched is not required. *See United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009) ("There need not be an allegation that the illegal activity occurred at the location to be searched, for example the home, but 'the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity.'") (quoting *Martin*, 297 F.3d at 1314). As the Eleventh Circuit has observed,

> [t]he justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained. In normal situations, few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime. *Kapordelis*, 569 F.3d at 1310. Moreover, an allegation that illegal activity occurred at the place to be searched, such as the home,

---

[5] This court did not set an evidentiary hearing on Defendant's probable cause claim because the court "looks to the face of the particular affidavit" at issue, as it was presented to the judge, in assessing probable cause. *See United States v. Hendon*, 253 F. App'x 809, 810-11 (11th Cir. 2007); *United States v. Anderson*, 152 F. App'x 915, 917 (11th Cir. 2005).

is not necessary, but the affidavit . . . should link the defendant to the home and connect the home to any criminal activity. *Id*. In establishing the link to criminal activity, it is not necessary that the home be the "locus" of criminal activity. *United States v. Bradley*, 644 F.3d 1213, 1264 (11th Cir. 2011). "Evidence that the defendant is in possession of contraband that is of the type that would normally expect to be hidden at [his] residence will support a search." *United States v. Anton*, 546 F.3d 1355, 1358 (11th Cir.2008); *see also United States v. Jenkins*, 901 F.2d 1075, 1080-81 (11th Cir. 1990) (holding that the affidavit was supported by probable cause because of the combination of the defendant's theft, the fact that the contraband was capable of being hidden in the home, and the statement of an experienced FBI agent that individuals who steal money often hide it in their homes).

*Donaldson*, 558 F. App'x at 968. *See also United States v. Hamda*, 647 F. App'x 1004, 1009 (11th Cir. 2016) (same); *United States v. Pendleton*, 447 F. App'x 978, 981 (11th Cir. 2011) (same); *Kapordelis*, 569 F.3d at 1310 (The warrant affidavit "must supply the authorizing magistrate with a reasonable basis for concluding that Defendant might keep evidence of his crimes at his home, i.e., a safe yet accessible place.") (citation and internal marks omitted).

### 1.    Connection between Carmen Lott and 2661 Dawes Court

Carmen Lott first argues that the affidavit improperly attempts to connect her to the subject residence based upon the phone number that was associated with the phone that she used when Johnnie Lott called her from jail. (Doc. 50, at 4). Carmen Lott contends that the number involved in the calls is a cell phone number and that, given the portable nature of a cell phone, there is no indication that the calls were made or received by her in her home, as the phone calls could have been received at any place in or outside of Alabama. *Id*. at 4-5.

In his affidavit, Ranson states that the person whom Johnnie Lott called from jail used the phone number subscribed to Carmen Lott at 2661 Dawes Court, Mobile, Alabama. (Doc. 54-1, at p. 9). According to Ranson's affidavit, on March 13, 2020, during a call between Carmen Lott and Johnnie Lott, Carmen placed a three-way call to her landlord about her lease and, during the phone call, she stated to the landlord that she lived at 2661 Dawes Court and was "trying to put money

on [her] account online." *Id*. at pp. 8-9. Ranson attests in his affidavit that he confirmed that the telephone number in question was subscribed to Carmen Lott at 2661 Dawes Court. *Id*. at p. 9. Additionally, Ranson's affidavit reflects that on April 15, 2020, during a three-way recorded phone call between Johnnie Lott, Carmen Lott, and a Mobile Police Department ("MPD") operator, Carmen Lott, in an attempt to discern why police officers had appeared at her home, confirmed that her address was 2661 Dawes Court. *Id*. at pp. 33-36. Ranson attests that he contacted MPD and spoke with a detective concerning the reason police officers responded to 2661 Dawes Court and was informed that MPD was investigating fraudulent gift cards being activated in the name of Johnnie Lott. *Id*. at p. 37. Based upon the foregoing, the court concludes that Ranson's affidavit established a sufficient connection between Carmen Lott and the residence that was searched.

### 2.     Connection between 2661 Dawes Court and Criminal Activity

Carmen Lott next argues that the affidavit fails to link her residence to the alleged criminal acts based on the content of the intercepted telephone calls themselves. (Doc. 50, at 5). However, Ranson's affidavit provides details of several recorded jail calls exhibiting a drug conspiracy in which Johnnie Lott sold drugs in jail and had the proceeds sent to Carmen Lott, thereby linking the 2661 Dawes Court residence to the criminal activity. As evidence of this, Ranson's affidavit notes certain recorded conversations, set forth below, and Ranson's interpretations of these conversations, which are based upon his training, experience, and knowledge of the investigation.

On March 8, 2020 at 9:28 p.m., Carmen Lott confirms that someone sent $300, and then Johnnie Lott is heard telling an unknown inmate to "Tell Larry I said give you that one, and I'll get you the other one tomorrow. Tell him to give you that last one." (Doc. 54-1, at pp. 3-4). Ranson states that during their conversation, Carmen Lott told Johnnie Lott that she received a payment for a drug transaction using the Cash App. *Id*. at p. 4. Ranson also advises that the investigation

uncovered Carmen Lott's Cash App account as $CLott6262 and that he believed that Johnnie Lott's conversation with the unknown inmate involved completing arrangements for a drug transaction involving "Larry." *Id*.

Also, on March 8, 2020 at 9:43 p.m., the recording reflects that Johnnie Lott tells Carmen Lott that "[w]e down to the last thirty piece" and "[a]ll of them going for one-fifty," and that Carmen says that she has a "whole lot . . . left," and then confirms that they had an $11,000 weekend. *Id*. at pp. 4-5. Ranson explains that he believes that Johnnie Lott was telling Carmen Lott that he distributed illegal controlled substances at a rate of $150.00 per pill. *Id*. at p. 6.

In a March 9, 2020 conversation, Carmen Lott tells Johnnie Lott that something came in the mail which is "green" and "vacuumed," and Johnnie tells her to "put it on the scale."  *Id*. at pp. 6-7. Carmen Lott then reports that the packaged weighs "28.6." *Id*. at p. 7. According to Ranson, he believed that Carmen Lott was referring to marijuana that needed to remain in a vacuumed bag and that the weight of the package was 28.6 grams. *Id*. at p. 8.

On March 14, 2020 at 7:30 p.m., Johnnie Lott says "I ain't got no more grams. I ain't got nothing but packs for one seventy-five." *Id*. at pp. 10-11. Ranson interprets this statement as meaning that "Johnnie Lott is advising Carmen Lott he has sold out of gram quantities of drugs and is only selling drugs inside the prison in 'packs' for $175 each." *Id*. at p. 11.

A March 16, 2020 phone call involving Johnnie Lott, Carmen Lott, an individual named "Trap," and an unidentified male, involves a discussion regarding the discrepancy of the weight of two packages. *Id*. at pp. 11-12. According to Ranson, he believed that two drug packages, weighing 27.9 and 25.6 grams, respectively, were smuggled into the Fountain Correctional Facility and that Johnnie Lott thought the packages should both weigh 29 grams. *Id*. at p. 13.

On March 17, 2020 at 3:22 p.m., during a three-way call involving Carmen Lott, Johnnie Lott, and "Trap," Johnnie asks Trap, "Where's my money?" to which Trap responds, "I gotta get her to send it. Send it to her, send that through Cash App." *Id*. Ranson's interpretation of this conversation is that the drug proceeds earned by "Trap" are to be sent to Carmen Lott's Cash App account. *Id*. at p. 14. Later that same day at 7:13 p.m. during a different phone call, Johnnie Lott and Carmen Lott discuss how "Mike Mike" sent $300 and "Trap" sent $100. *Id*. at pp. 14-15. On the call, Carmen Lott mentions that "Trap" attempted to send some money "to the email" and stated that the Cash App balance was $8,116. *Id*. at p. 15. Ranson states in his affidavit that he believes that Carmen Lott receives drug proceed payments to her email accounts. *Id*. At 8:00 p.m. on March 17, 2020, Johnnie Lott asks Carmen Lott, "What I cleared off them ninety?" and Carmen confirms that he made about "fifteen" or "more than that." *Id*. at pp. 15-16. Carmen Lott also says that she "cleared the Cash App twice." *Id*. at p. 16. Ranson states that he believes that this call reflects that Johnnie Lott asked Carmen Lott how much money he made from selling "90" grams of drugs, that Carmen confirmed a profit of at least $15,000.00, and that Carmen admitted to having withdrawn drug proceeds received from her Cash App account twice, which brought the Cash App balance back to zero. *Id*.

Ranson states that during a recorded conversation between Carmen and Johnnie Lott on March 18, 2020, Carmen read a letter from Wells Fargo Bank requesting additional information about a loan application. *Id*. at p. 17. According to Ranson, "[w]hen Carmen Lott stated[,] 'Provide letter of explanation for large deposits of $2,087.02 on 12/11, $1,754.76 on 01/17, $3,013.12 on 2', on February the 3rd. I think all them GreenDot!' and 'So I'm gonna have to figure out what the fuck can I say about, how the fuck I got some god damn,'" he believed that Carmen Lott was concerned with having to legitimize the transactions in an effort to receive approval for the home

loan. *Id*. at p. 18. The affidavit reflects that Carmen Lott stated that she could say that she did hair in the kitchen at home. *Id*.

According to Ranson, on March 21, 2020, Johnnie Lott and Carmen Lott discussed the balance on the Cash App and that when Carmen later says, "It's looking like twenty-four sixty-five profit," she was referencing the profit from the sales of drugs on that date. *Id*. at pp. 19-21.

Ranson recounts a conversation on March 25, 2020, in which Carmen Lott said that she had to "take the money out of [her] purse before [she] lay down," and Ranson states that as Carmen recites the numbers "28, 25, 6" the sound of a safe dial turning can be heard in the background. *Id*. at pp. 23-24. Ranson attests that it is his belief that the recitation of the numbers references the combination to the safe located at the residence. *Id*.

On April 2, 2020, during a call between Johnnie Lott and Carmen Lott, Johnnie tells Jyrah Lott that he gave her a key so that she can get his money if Carmen dies. *Id*. at pp. 24-25. Johnnie then tells Jyrah to stay away from the safe that is near the bathroom and that he saw her go in the "bathroom round [his] safe." *Id*. Ranson interprets this conversation as Johnnie Lott's confirming the existence of a safe and video surveillance cameras inside the residence. *Id*. at p. 25. In an April 8, 2020 call, Carmen Lott tells Johnnie Lott that she put the money in the safe. *Id*. at pp. 25-26.

On April 14, 2020 at 9:01 a.m., Johnnie Lott asks Carmen Lott if she took "the $3,000 off of Cash App." *Id*. at p. 26. Johnnie subsequently asks, "Did you move the money from the thing to the safe?" *Id*. at p. 27. Later in the call, Carmen says that "at home" she has "$139,793." *Id*. Ranson states that he believes that "the participants of the conversation acknowledged the safe located at 2661 Dawes Court." *Id*. at p. 28. Also, on April 14, 2020 at 9:32 a.m., Johnnie Lott says, "I'm selling Flokka. . . . We from Mobile, we sell Flokka." *Id*.

In a conversation on April 19, 2020, when discussing how much money Johnnie Lott makes, Carmen Lott tells Johnnie, "You don't know what goes on. I keep up with the books." *Id*. at p. 38. Ranson states that this conversation confirmed her involvement in Johnnie Lott's criminal activity. *Id*. at pp. 38-39. Later in their conversation on April 19, 2020, Johnnie tells Carmen that the "Flokka" has not arrived because the "Coronavirus" has resulted in "nothing coming from China," and says, "We'll make about thirteen bands" off of the "[l]ast fifty-eight." *Id*. at p. 39. Ranson states in his affidavit that Johnnie confirmed that he received packages containing "Flokka" from China; that China is the main source for illegal synthetic chemical compounds that are used to make the drug "Flokka"; and that Johnnie acknowledged that he possessed 58 grams of drug product and would profit by $13,000.00. *Id*. at pp. 39-40.

 On an April 21, 2020 phone call, Carmen Lott tells Johnnie Lott that she bought "one of those vacuum seal things for the food or whatever." *Id*. a p 40. Johnnie then says, "And the dope!", to which Carmen replies, "Well that's really what I got it for." *Id*. In his affidavit, Ranson states that both Johnnie and Carmen Lott are confirming that the vacuum sealer will be used to package narcotics so that the odor of the narcotics will not permeate from the containers. *Id*. at pp. 40-41.

Lastly, on April 27, 2020, in a conversation involving Carmen Lott, Jyrah Lott, and Johnnie Lott, Johnnie tells Jyrah, "Where I got $200,000, an I done bought everything y'all own out that mother fucker, from the penitentiary! So if you can't figure it out and you're free! You mother fuckers don't ever need to come over my . . . house!" *Id*. at p. 41. In his affidavit, Ranson states that Johnnie is upset with his daughter, Jyrah, for wasting her time in college and is telling her that he purchased everything that Carmen and Jyrah owned while he has been incarcerated in prison. *Id*. at pp. 41-42.

Given the circumstances outlined above, and reading the search warrant affidavit as a whole, this court readily concludes that the affidavit submitted in support of the search warrant in this case sufficiently established a reasonable basis to conclude that Carmen Lott and Johnnie Lott were engaging in criminal activity and that evidence of drug distribution and money laundering would be found at Carmen Lott's residence at 2661 Dawes Court, Mobile Alabama. *See Donaldson*, 558 F. App'x at 968. Under the totality of the circumstances, the court finds that Judge Bivins made a common sense determination that a fair probability existed that evidence of drug distribution and money laundering would be found in the place to be searched. *See Gates*, 462 U.S. at 238. The evidence, viewed as a whole, provided a "substantial basis" for the judge's finding of probable cause, and there is no Warrant Clause violation here. *See Upton*, 466 U.S. 727, 732-33; *Gates*, 462 U.S. at 238-39.

Defendant Carmen Lott argues that "the affidavit attempts to link Carmen Lott's residence to the alleged criminal acts based on the content of the intercepted telephone calls. But such an attempt fails based on the content of the calls themselves." (Doc. 50, at 5). Specifically, Carmen Lott argues that there is nothing in the search warrant to suggest that the safe is located in Carmen Lott's home. *Id*. For example, Carmen Lott maintains that Ranson's belief that that there was a noise in the background of the call which suggested that a person was turning a combination knob of a safe, and that the numbers recited on the call are the actual combination of the safe, is merely supposition, without any basis in fact establishing that there was a safe or that it was located at 2661 Dawes Court. *Id*.

The court cannot agree. First, there is clear evidence from the affidavit that a safe did exist. In the cited transcript excerpts of the recordings, there are several references to a safe. *See* Doc. 54-1, at pp. 24-25 (April 2, 2020 conversation in which Johnnie Lott instructs Jyrah Lott not to go

the "bathroom round [his] safe"); *id*. at p. 25 (April 8, 2020 conversation in which Johnnie Lott

asks Carmen Lott if she "set the alarm", to which she responds, "Yes, I did and I put the money in

the safe."); *id*. at p. 27 (April 14, 2020 conversation in which Johnnie Lott asks Carmen Lott if she

moved "from the thing to the safe".).

Second, as stated above, there was evidence in the affidavit linking Carmen Lott to the

residence at 2661 Dawes Court. Also, in the April 2, 2020 conversation between Johnnie and Jyrah

Lott, Johnnie instructs Jyrah not to go the "bathroom round [his] safe." *Id*. at p. 24. Carmen Lott

argues that "Ranson prefaced the quoted conversation by saying it was 'between Carmen Brooke

Lott and Johnnie Paige Lott,' but this is not correct, as is evident from the quoted passage in the

affidavit." (Doc. 50, at 5). However, although Ranson's affidavit initially indicates that "[o]n April

2, 2020, at approximately 9:40 p.m., a conversation between Carmen Brooke Lott and Johnnie

Paige Lott was recorded," the affidavit subsequently states, in brackets, "[Approximately 1 minute

and 45 seconds into the conversation.]" and then lists "Johnnie Lott - (JL)" and "Jyrah Lott -

(Jyrah)" as the participants to the conversation. *See* Doc. 54-1, at p. 24. During the conversation,

Jyrah explains to Johnnie that she did not care about his safe and only went into the bathroom "to

get some eyelashes." *Id*. at pp. 24-25.

Further, later in the affidavit when discussing an April 27, 2020 conversation between

Jyrah and Johnnie in which Johnnie states that he "done bought everything y'all own" and that

they "don't ever need to come over [to his] . . . house!", Ranson identifies Jyrah as Johnnie's

daughter. *Id*. at p. 41. Reading the affidavit as a whole, the court concludes that there was a

substantial basis to believe that a safe may be found at 2661 Dawes Court. *Anton*, 546 F.3d at 1358

("Evidence that the defendant is in possession of contraband that is of the type that would normally

expect to be hidden at [his] residence will support a search."); *Jenkins*, 901 F.2d at (considered as

a factor in holding that the affidavit was supported by probable cause was the statement of an experienced FBI agent regarding typical actions of criminals engaged in certain criminal activity).

Carmen Lott also argues that Ranson improperly inferred from the recorded phone calls that there were large sums of money to be found at Carmen Lott's residence, as the calls contained comments regarding the payment of money to "Cash App" or "Green Cards," which are third party applications or third party cards. (Doc. 50, at 5-6). Carmen Lott contends that if the money alleged to be gained by Johnnie Lott were paid onto these cards or apps, then that money would not be physically in the possession of Carmen Lott, but instead would be held in accounts associated with the apps and cards. *Id*. at 6. However, a sample of the calls show that on March 25, 2020 Carmen Lott stated that she had to "take the money out of [her] purse before [she] lay down"; on April 2, 2020 Johnnie Lott told Jyrah Lott that he gave her a key so that she could get his money if Carmen Lott died and also told her to stay away from the safe that was near the bathroom; on April 8, 2020 Carmen Lott told Johnnie Lott that she put the money in the safe; on April 14, 2020 Johnnie Lott asked Carmen Lott if she took "the $3,000 off of Cash App," and subsequently asked, "Did you move the money from the thing to the safe?", and Carmen later said that "at home" she had "$139,793"; and on April 19, 2020, when discussing how much money Johnnie Lott makes, Carmen Lott told Johnnie, "You don't know what goes on. I keep up with the books." (Doc. 54-1, at pp. 23-27, 38). Accordingly, Ranson's affidavit provides substantial evidence to believe that large sums of money would be found at the residence.

Carmen Lott further argues that the affidavit by Ranson failed to show that drugs would be located at Carmen Lott's residence. (Doc. 50, at 6). Carmen Lott maintains that the recorded calls cited by Ranson suggest that any illegal drugs were actually taken *from* her home and delivered to some other location and, therefore, any substance sought out by the search warrant would have

been moved to some other location. *Id*. This argument seems to acknowledge that the recordings suggest that drugs were once present at her residence. It also ignores the possibility that not all of the drugs were moved or that there may still have been evidence of the drugs' being distributed from that location. In any event, the recordings cited by Ranson in his affidavit reflect that on March 8, 2020, Johnnie Lott told Carmen Lott that "[w]e down to the last thirty piece" and "[a]ll of them going for one-fifty," and that Carmen said that she had a "whole lot . . . left"; on March 9, 2020, Carmen Lott told Johnnie Lott that something came in the mail which was "green" and "vacuumed," and Johnnie told her to "put it on the scale"; and on April 21, 2020, Carmen Lott told Johnnie Lott that she bought "one of those vacuum seal things for the food or whatever," Johnnie responded, "And the dope!", to which Carmen replied, "Well that's really what I got it for." (Doc. 54-1, at pp. 6-7, 40). Based on the foregoing, the court concludes that Ranson's affidavit provided sufficient evidence linking illegal drug activity to the residence and the possibility that drugs would be discovered there.

### B.     Carmen Lott—Evidentiary Hearing

Defendant Carmen Lott "requests that the Court conduct an evidentiary hearing on this matter," but does not specify the reason that a hearing is necessary. (Doc. 50, at 1). Although Carmen Lott does not characterize it as such, her request is for a *Franks*[6] hearing, apparently as a general challenge to Ranson's affidavit. In reciting the factual background in her brief, Carment Lott complains that Ranson omitted from his affidavit the fact that codefendant Maurice Sanders was caught within Kilby Correctional Facility ("KCF") with methamphetamine and marijuana four days prior to the search warrant being issued. *Id*. at 3. The government maintains that Carmen Lott has not met her burden of showing that an evidentiary hearing is required. (Doc. 54, at 7).

---

[6] *Franks v. Delaware*, 438 U.S. 154 (1978).

The Supreme Court has made it clear that "[t]here is ... a presumption of validity with respect to the affidavit supporting the search warrant." *Franks*, 438 U.S. at 171.

> In *Franks*, the Supreme Court held the Fourth Amendment requires a district court to hold a hearing when a defendant makes a substantial preliminary showing that: (1) a warrant affiant made intentionally false or recklessly misleading statements (or omissions); and (2) those statements, or omissions, were necessary to the finding of probable cause. 438 U.S. 154, 155-56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The defendant must (1) allege deliberate falsehood or reckless disregard for the truth; (2) specifically point to the allegedly false portions of the warrant affidavit; and (3) provide an offer of proof, including sworn affidavits or otherwise reliable witness statements, or satisfactorily explain the absence of such evidence. *Id*. at 171, 98 S.Ct. 2674. If, upon such a showing, the content in the affidavit remains sufficient to support a finding of probable cause, then no hearing is required. *Id*. at 171-72, 98 S.Ct. 2674.

*United States v. Ward*, 732 F. App'x 861, 862 (11th Cir. 2018). "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Franks*, 438 U.S. at 171. The allegations of deliberate falsehood or of reckless disregard for the truth "must be accompanied by an offer of proof." *Id*. "Allegations of negligence or innocent mistake are insufficient." *Id*. Moreover, "[i]nsignificant and immaterial misrepresentations or omissions will not invalidate a warrant. *United States v. Ofshe*, 817 F.2d 1508, 1513 (11th Cir. 1987). "Indeed, every fact recited in an affidavit in support of an application for a search warrant does not necessarily have to be correct, but the affidavit must be truthful in the sense that it is believed or appropriately accepted by the affiant as true." *United States v. Gamory*, No. CRIM 108-CR-153-TWT, 2009 WL 855948, at *18 (N.D. Ga. Mar. 30, 2009), *aff'd*, 635 F.3d 480 (11th Cir. 2011) (citing *Franks*, 438 U.S. at 165 ("This does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But

surely it is to be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true.").

Here, Carmen Lott fails to meet her burden of showing that an evidentiary hearing is required, as she does not provide "[a]ffidavits or sworn or otherwise reliable statements of witnesses," *see Franks*, 438 U.S. at 171, explaining how the omission rises to the level of a deliberate falsehood or reckless disregard for the truth. *See U.S. v. Flowers*, 531 F. App'x 975, 980 (11th Cir. 2013) ("the defendant's attack 'must be more than conclusory' and the allegations of deliberate falsehood or reckless disregard for the truth 'must be accompanied by an offer of proof.'") (citation omitted); *see also United States v. Arbolaez*, 450 F.3d 1283, 1293 (11th Cir. 2006) (concluding that defendant did not satisfy the substantiality requirement for a *Franks* hearing because he relied on hearsay statements and did not submit affidavits or other sworn statements).

Moreover, even assuming an acceptable offer of proof, a defendant is still not entitled to a *Franks* hearing if there is no showing that the omitted facts would have precluded a finding of probable cause. "Even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." *United States v. Sarras*, 575 F.3d 1191, 1218 (11th Cir. 2009) (quotation marks and brackets omitted). "[O]nly in rare instances" may a "*Franks* hearing . . . be merited when facts have been omitted in a warrant application," because "[a]llowing omissions to be challenged would create a situation where almost every affidavit of an officer would be questioned*." Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998); *United States v. Kight*, No. 118CR00169TWTRGV, 2019 WL 1781356, at *5 (N.D. Ga. Mar. 11, 2019), *report and recommendation adopted*, No. 1:18-CR-169-TWT, 2019 WL 1778048 (N.D. Ga. Apr. 23, 2019). Here, Sanders's possession of methamphetamine and marijuana seemingly bolster evidence of drug distribution's occurring within KCF. Further, as

previously set forth above, there is sufficient evidence in the warrant affidavit to support a finding of probable cause even when considering this additional fact.

Accordingly, Carmen Lott is not entitled to a *Franks* hearing in this case, and the affidavit supporting the search warrant must be presumed to be valid. *Franks*, 438 U.S. at 171-72.

### C.    Carmen Lott-Marital Communication Privilege

Defendant Carmen Lott contends that Judge Bivins improperly considered the content of the recorded jail calls between herself and her husband, Defendant Johnnie Lott, because these communications are protected by the marital communications privilege. (Doc. 50, at 7). Without citing case law in support, Carmen Lott argues that the privilege was not waived as a result of the warning used by the ADOC informing participants that their calls are subject to recording and monitoring. *Id*. Specifically, Carmen Lott cites Alabama Rules of Evidence Rule 504(b)'s spousal privilege.[7]

Rule 501 of the Federal Rules of Evidence provides that the "common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege," unless "the United States Constitution; a federal statute; or rules prescribed by the Supreme Court" provide otherwise, "[b]ut in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501; *Hancock v. Hobbs*, 967 F.2d 462, 466 (11th Cir. 1992). "Put simply, federal courts follow the federal common law regarding privileges in federal criminal proceedings." *United States v. Espino*, 317 F.3d 788, 795 (8th Cir. 2003); *United States v. Marashi*, 913 F.2d 724, 729 (9th Cir. 1990) (citing Fed. R. Evid. 501).

---

[7] Rule 504(b) provides: "In any civil or criminal proceeding, a person has a privilege to refuse to testify, or to prevent any person from testifying, as to any confidential communication made by one spouse to the other during the marriage." Ala. R. Evid. 504(b).

"One such privilege repeatedly recognized by common law principles is the marital privilege." *United States v. Mendoza*, 574 F.2d 1373, 1379 (5th Cir. 1978)[8]; *United States v. Pugh*, 162 F. Supp. 3d 97, 101 (E.D.N.Y. 2016), *aff'd*, 937 F.3d 108 (2d Cir. 2019), *opinion amended and superseded*, 945 F.3d 9 (2d Cir. 2019), *and aff'd*, 945 F.3d 9 (2d Cir. 2019) ("Accordingly, where—as here—a party asserts a marital privilege, the court looks to federal common law to determine the scope and applicability of the privilege.").

"The marital communications privilege . . . excludes information privately disclosed between husband and wife in the confidence of the marital relationship. However, the privilege does not apply to communications made in the presence of third parties, and generally applies only to utterances, not acts." *United States v. Abram*, 171 F. App'x 304, 310 (11th Cir. 2006) (citations omitted). The privilege "also does not apply to conversations between husband and wife about crimes in which they are jointly participating." *Id.*; *Mendoza*, 574 F.2d at 1381.

Carmen Lott does not dispute that the ADOC advised both parties to the call that their conversation was being recorded. Given that Carmen Lott was aware that her phone call was being recorded, the court concludes that she did not have a reasonable expectation of privacy regarding these conversations and that these conversations are not protected by the marital communications privilege. "The presence of [a] recording device [is] the functional equivalent of the presence of a third party." *United States v. Hatcher*, 323 F.3d 666, 674 (8th Cir. 2003) (alterations added); *see id.* (in the context of attorney-client privilege, the Eight Circuit reasoned, "Because the inmates and their lawyers were aware that their conversations were being recorded, they could not reasonably expect that their conversations would remain private. . . . These conversations were not

---

[8] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

privileged."); *United States v. Madoch*, 149 F.3d 596, 602 (7th Cir. 1998) (marital communications privilege did not apply to recorded jail calls where the spouse seeking to invoke the privilege knew that the other spouse was incarcerated); *United States v. Barlow*, 307 F. App'x 678, 681 (3d Cir. 2009) (holding that an incarcerated defendant's phone conversations with his wife were not privileged); *United States v. Tartaglione*, 228 F. Supp. 3d 402, 408 (E.D. Pa. 2017) (finding that prison phone calls between defendant and her husband were not protected under the confidential marital communications privilege because they were not made in confidence.). Moreover, the marital communications privilege does not apply to conversations in which Carmen and Johnnie Lott discussed crimes in which they were jointly participating. *Abram*, 171 F. App'x at 310.

Accordingly, for these reasons, Carmen Lott's conversations are not protected by the marital communications privilege.

### D.  Johnnie Lott

The government contends that Defendant Johnnie Lott does not have standing to challenge the search warrant affidavit and the search of the residence located at 2661 Dawes Court. (Doc. 56, at 1). Fourth Amendment rights are personal rights, and only defendants whose Fourth Amendment rights have been violated may benefit from the Fourth amendment's protections. *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) "To have standing, a defendant bears the burden of showing a legitimate expectation of privacy in the area searched." *United States v. Brazel*, 102 F.3d 1120, 1147 (11th Cir. 1997). A person alleging an unconstitutional search must establish both a subjective expectation and an objective expectation of privacy. *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008). "'The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that the privacy expectation be one that society is prepared to recognize as reasonable.'" *United States v. Segura-Baltazar*, 448 F.3d

1281, 1286 (11th Cir. 2006) (citation omitted). "A legitimate expectation of privacy [must] be proven by factors beyond mere possession, such as a right to exclude or a right to privacy." *Harris*, 526 F.3d at 1338 (citation omitted). "While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of . . . [the] inquiry." *United States v. Salvucci*, 448 U.S. 83, 91 (1980) (citation omitted). "Other factors to be weighed include whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises." *United States v. Henry*, 939 F. Supp. 2d 1279, 1286 (N.D. Ga. 2013). "A defendant may have a reasonable expectation of privacy in a home that he does not own or rent if he shows 'an unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence on the premises as a mere guest or invitee.'" *United States v. Campbell*, 434 F. App'x 805, 810 (11th Cir. 2011) (citation omitted).

The government has presented evidence that Johnnie Lott has been incarcerated as an ADOC inmate since at least December 5, 2003. *See* Doc. 56-2. Johnnie Lott married Carmen Lott on September 20, 2018—while he was incarcerated. *See* Doc. 56-3. Johnnie Lott has not presented any evidence establishing his standing to challenge the search of 2661 Dawes Court. As an incarcerated inmate in the custody of ADOC since 2003, Johnnie Lott has not shown that he had an unrestricted right of occupancy or custody and control of the residence. Accordingly, based upon the circumstances in this case, the court concludes that Johnnie Lott lacks standing to challenge the search warrant and the search of the residence at 2661 Dawes Court, Mobile, Alabama.

Moreover, even if Johnnie Lott did have standing to challenge the search of the residence, his challenge would still fail for the same reasons articulated above in connection with Carmen Lott's motion to suppress. Johnnie Lott asserts essentially the same arguments as Carmen Lott. Based upon the foregoing, the court finds that Johnnie Lott's motion to suppress should be denied.

## V.   Conclusion

Accordingly, for the reasons stated above and consistent with the discussion herein, it is the RECOMMENDATION of the Magistrate Judge that Defendant Johnnie Lott's motion to suppress (Doc. 49) and Defendant Carmen Lott's motion to suppress (Doc. 50) be DENIED. It is further

ORDERED that the parties shall file any objections to the said Recommendation on or before December 22, 2021. Any objections filed must specifically identify the findings in the Magistrate Judge's recommendation to which the party objects. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the magistrate judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).

DONE, on this the 8th day of December, 2021.

/s/ Susan Russ Walker
Susan Russ Walker
United States Magistrate Judge